Scott M. Riemer (SR 5005)
RIEMER & ASSOCIATES LLC
Attorneys for Plaintiff
60 East 42nd Street, Suite 1750
New York, New York 10165
(212)297-0700
sriemer@riemerlawfirm.com

UNITED STATES DISTRICT COURT
OF CONNECTICUT
---------------------------------------------------X
PATRICIA HUGHES

     Plaintiff,                         3-19 CV 1611
v.

                                 **COMPLAINT**

THE HARTFORD LIFE AND
ACCIDENT INSURANCE              ECF CASE
COMPANY

                       Defendant.
---------------------------------------------------X

COMES NOW Plaintiff, Patricia Hughes ("Ms. Hughes"), and files this Complaint against Defendant Hartford Life and Accident Insurance Company ("Hartford"), showing the Court as follows:

**PREVIOUS HISTORY, JURISDICTION AND PARTIES**

1.      This lawsuit reflects the continuation of a lawsuit previously filed in this Court on September 18, 2017, styled *Hughes v. Hartford Life and Accident Insurance Company*, 3:17-cv-0151-JAM. By Order dated March 25, 2019, the Honorable Jeffrey Alker Meyer, United States District Judge for the District of Connecticut, found that Defendant Hartford violated the provision of the Employee Retirement Income Security Act of 1974 as amended ("ERISA"), 29 U.S.C. § 1001 et seq., requiring a "full and fair review" of claims.  Judge Meyer remanded the claim to Hartford "for a full and fair review of plaintiff [Patricia Hughes]'s claim."

2.      Defendant has completed its post-remand review and upheld its decision to terminate Ms. Hughes' Long Term Disability ("LTD") benefits effective October 6, 2016.

3.      The ERISA administrative process is now fully exhausted, and the matter is ripe for a *de novo* judicial determination on the merits as to whether additional disability benefits are due Ms. Hughes.

4.      On remand, Hartford directly violated this Court's Order of March 25, 2019. (Hughes I, Docket 72, p. 17).  On remand Hartford has yet again: (1) unilaterally terminated the administrative process; (2) refused to allow Ms. Hughes a response to late-arriving medical opinions, in violation of ERISA's "full and fair review" requirements; and (3) relied heavily on those medical opinions in the final decision.  As this Court's prior Order stated: "No common sense notion of what it means to have a full and fair review can be squared with a review process that denies a claimant access to key information that will be the very basis for a health or disability plan to deny benefits. Full and fair review suggests a review that is thorough, comprehensive, and transparent—not one in which a plan may order up a doctor's report at the final hour and then deny the claimant access to this information until it is too late for the claimant to respond."  *Id.*

5.      Ms. Hughes now files this ERISA action to recover LTD benefits under the terms of an employee welfare benefit plan (hereafter "The LTD Plan") maintained by Children's Healthcare of Atlanta and to clarify and/or enforce her rights under the Plan.

6.      The LTD Plan is an "Employee Welfare Benefit Plan" as defined by ERISA, 29 U.S.C. § 1002(1).

7.      Jurisdiction is based on ERISA, 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

8.      Venue is proper in the United States District Court for District of Connecticut

pursuant to 29 U.S.C. § 1132(e)(2) because Hartford conducts business in Connecticut and its principal place of business is located within the District.

9.      Hartford is a Connecticut corporation.

10.     Ms. Hughes is a "participant" in the LTD Plan, as defined by ERISA, 29 U.S.C. § 1002(7).

11.     The LTD Plan is insured by group policy of insurance GLT-395146 issued by Defendant Hartford.

12.     Hartford has made all decisions concerning claims for benefits and has handled all communications concerning Ms. Hughes' claim.

13.     All benefits under the LTD Plan are paid from the general assets of Defendant Hartford.

## RELEVANT POLICY PROVISIONS

14.     The allegations of paragraphs 1 through 13 are hereby realleged as if set forth herein verbatim.

15.     A copy of the LTD Policy is attached hereto as Exhibit A and is incorporated herein by reference.

16.     Under the LTD Plan, Hartford promised to pay "Disability Benefits" to Ms. Hughes, as follows:

> We will pay you a Monthly Benefit if You:
>     1) become Disabled while insured under The Policy;
>     2) are Disabled throughout the Elimination Period;
>     3) remain Disabled beyond the Elimination Period; and
>     4) submit Proof of Loss to us.

17.     The Policy further states:

> *Disability or Disabled means You are prevented from performing one or more of the Essential Duties of:*
>> *1) Your Occupation during the Elimination Period;*
>> *2) Your Occupation, for the 24 month(s) following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings, and;*
>> *3) after that, Any Occupation.*

18.     The Policy further states:

> *Any Occupation means any occupation for which You are qualified by education, training or experience, and that has an earnings potential greater than the lesser of:*
>> *1) the product of Your Indexed Pre-disability Earnings and the Benefit Percentage, or;*
>> *2) the Maximum Monthly Benefit.*

## BRIEF SUMMARY OF CLAIM

19.     The allegations of paragraphs 1 through 18 are hereby realleged as if set forth herein verbatim.

20.     This is a dispute over Hartford's termination of Ms. Hughes' LTD benefits. Initially, Hartford conceded that Ms. Hughes was "Disabled" under the Plan's "Any Occupation" definition.   Then, Hartford unilaterally reversed its position in the absence of any evidence of improvement in Ms. Hughes' condition.

21.     Ms. Hughes suffers from a serious, debilitating vestibular problem which has been objectively verified by medical tests and by longstanding clinical observations.   In 2012, her vestibular symptoms were severely exacerbated by a medical attempt to use Gentamycin drops to destroy the malfunctioning left side of her vestibular system. The procedure backfired, causing her symptoms to worsen drastically. Now she suffers unpredictable bouts of serious imbalance,

spinning vertigo, crippling migraine headaches, nausea and dry heaves.

22.     Ms. Hughes' symptoms are easily provoked by bright lights, motion, and reading or use of a computer, among other things. Oftentimes the symptoms occur without provocation.

23.     Although Ms. Hughes is encouraged by her treating providers to engage in light activity when her symptoms allow it, all agree that her condition leaves her *totally incapacitated* unpredictably – often for hours or days at a time.  As a result, she is unemployable at all times relevant to this action.

## DETAILED HISTORY OF CLAIM

24.     The allegations of paragraphs 1 through 23 are hereby realleged as if set forth herein verbatim.

25.     Prior to becoming disabled, Ms. Hughes was employed as a Pediatric Intensive Care Data Specialist with Children's Healthcare of Atlanta.

26.     In early 2011, Ms. Hughes began having intermittent episodes of vertigo, especially when driving.  She experienced episodes of vertigo at least five times a week, lasting anywhere from two to ten minutes each.  After each vertigo episode passed, she became overcome with nausea. She continued to experience these symptoms several times per day, as well as accompanying fatigue, headaches, and depression. At times she experienced vertigo immediately upon waking in the morning.

27.     In August of 2012, otolaryngologist Karen Hoffmann, M.D., noted that Ms. Hughes had been incapacitated by severe vertigo for over four days. During this time, Ms. Hughes was walking into walls and experiencing extreme disequilibrium.  Ms. Hughes was unable to drive,

walk, or work, and was severely nauseated.

28.     Vestibular therapist Dr. Gaye Cronin also began treating Ms. Hughes in September of 2012.  During this treatment, Ms. Hughes reported complained of imbalance, dizziness, nausea, and vertigo.

29.     Ms. Hughes underwent substantial objective testing.   The objective testing confirmed vestibular dysfunction including both positional and provoked vertigo resulting in severe functional impairments.   Abnormal objective tests included: (a) audiograms; (b) electronystagmogram (or ENG); (c) videonystagmogram (VNG); (d) caloric testing; (e) the Dix-Hallpike clinical maneuver; and (f) several different tests of balance known as posturography.

30.     In 2012, Ms. Hughes also began treating for related migraine headaches with Atlanta Neurology.  Among other procedures she underwent nerve blocks and received Botox injections.

31.     Ms. Hughes' combination of symptoms forced her to stop working, and she claimed disability in August of 2012.

32.     Hartford began paying LTD benefits on November 26, 2012, under the Plan's "Your Occupation" definition of Disabled.

33.     Ms. Hughes' employer could no longer accommodate her condition, and, as noted by Susan Peterson on March 29, 2013, "due to limited functionality, employee would have difficulty at this time for a job search – she does not have at least three (3) hours a day of functionality."

34.     In February of 2013, despite ongoing symptoms, Ms. Hughes attempted a very limited return to work. She intended to work from home for two hours a day, with most of the

work done on a computer. It quickly became clear that using a computer monitor would consistently provoke her symptoms. Even this modest level of activity caused her severe headaches and vertigo to increase dramatically in frequency and severity.

35.     After three weeks of attempting to work two hours per day from home, Ms. Hughes was waking with headaches so severe that she was reduced to tears and totally unable to function. She could not even start her work, much less complete it.

36.     Despite Ms. Hughes' motivation and determination, her return to work experiment failed because even two hours of work activity per day was enough to exacerbate her condition to an intolerable state.

37.     At all times since stopping work, Ms. Hughes' vertigo and disequilibrium has unpredictably but regularly caused her to be unsteady on her feet, and she has experienced numerous falls over the last few years.

38.     On September 20, 2014, more than two years into the disability claim, Hartford adjuster Susan Peterson noted in her summary detail report that Ms. Hughes' "[o]verall disabling condition continues to be her vertigo.  Vertigo triggered by any type of movement, noise, bright lights, and reading. Vision starts bouncing.  Does not drive at all and avoids social gatherings because of the visual stimuli and noise."

39.     On November 26, 2014, the definition of Disabled changed under the Policy from "Your Occupation" to "Any Occupation."

40.     In her November 26, 2014 summary detail report, Hartford examiner Linda Spinler noted that Ms. Hughes treated "with transcranial labyrinthotomy on 06-26-2012 due to dizziness/vertigo, and continued to work until August 27, 2012, when symptoms worsened.  She

returned to work part-time from home February 4, 2013, to March 19, 2013, but increased vertigo and daily headaches/migraines, was unable to continue."

41.     In the context of Hartford's "Any Occupation" investigation, Hartford performed surveillance on Ms. Hughes on December 4, 2014. Ms. Hughes was observed for 3 minutes and 42 seconds, during which time she sat on her porch with coffee and walked off her porch to hand something to the trash collectors.

42.     Based on the totality of the evidence including this surveillance, Hartford conceded Ms. Hughes remained disabled under the Any Occupation definition.   LTD benefits were continued.

43.     In her September 22, 2015 Attending Physician Statement, Dr. Gaye Cronin stated that Ms. Hughes' expected duration of symptoms was "indefinite" due to the severity and chronic nature of her vertigo and imbalance.   Dr. Cronin further stated Ms. Hughes "remains totally disabled."

44.     On April 7, 2016, nearly four years into the claim, Cassandra Jung of Hartford decided the claim warranted aggressive re-investigation simply because, in her non-medical-expert view, "Restrictions and limitations appear overstated based on claim findings." Ms. Jung perceived inconsistencies between a September 29, 2015 Physicians form response and the fact that Ms. Hughes openly discussed in a phone call a recent attempt to visit family in Indiana.

45.     Ms. Jung referred the file for additional surveillance and to Hartford's Special Investigations Unit, or "SIU," which Hartford routinely calls in on claims it deems suspicious.

46.     Hartford thereafter began to aggressively investigate the claim.

47.     On April 15, 2016, Hartford undertook another 9 hours of surveillance, wherein

Ms. Hughes' only activity was to walk her dog slowly through her neighborhood for 16 minutes. The remaining 8 hours and 42 minutes of the surveillance revealed no activity at all outside the home.

48.     On April 26, 2016, Hartford once again arranged surreptitious surveillance during which Ms. Hughes was confined to her home for 6.5 hours.

49.     The only activity observed on April 26, 2016 was when Ms. Hughes again walked her dog for about 24 minutes and performed light weeding in her garden with assistance from a friend intermittently for about two hours.

50.     Placed in proper context, the surveillance revealed nothing new or contradictory to her claim. Ms. Hughes has consistently admitted, and her doctors have confirmed, that *when her symptoms are less severe* she *should* walk her dog at a slow pace, pull weeds, or do other activities that do not involve bright (especially fluorescent) lights, motion around her, reading, or using a computer. Her doctors encourage her to do so because such activity challenges the vestibular system.

51.     Hartford's second round of surveillance did not yield any information materially different than what Hartford obtained in the first round of surveillance in December of 2014, *after which Hartford conceded Ms. Hughes was totally disabled from Any Occupation*.

52.     In May of 2016, Hartford insisted that Ms. Hughes undergo an in-person interview at her home. In this interview Ms. Hughes was asked if she traveled to Indiana. She confirmed she had traveled to Indiana with an escort, and with medically supervised travel precautions. These precautions included, according to Ms. Hughes' vestibular therapist, increasing anti-nausea and/or anti-vertigo medications, avoiding sitting by a window, and using special nasal sprays if symptoms

are provoked.  Despite all these precautions, the impact of the travel was such that Ms. Hughes wound up in a wheelchair, unable to walk, with exacerbated symptoms on both ends of her trip. The lights, chaos and motion in the airport predictably exacerbated her symptoms. Vestibular therapist Gaye Cronin contemporaneously confirmed these same facts in her records.

53.     Nothing about Ms. Hughes' trip supported the conclusion she was able to resume full time employment.

54.     Despite this, Hartford later unreasonably construed this trip as evidence that Ms. Hughes could somehow tolerate consistent, full-time employment.

55.     During the interview Ms. Hughes did not deny the activity noted during surveillance. Ms. Hughes explained that when her symptoms are tolerable, her doctors encourage her to do as much non-physically demanding activity as she can tolerate, at her own pace and on her own schedule.  However, she also confirmed that when her symptoms are active, she cannot do *anything* productive.

56.     Hartford next had its employee nurse, Ms. Maitland, review the paper file on August 3, 2016.  Ms. Maitland noted that the claim was being "proactively reviewed for investigation as the restrictions and limitations appear to be overstated." Hartford's own notes confirm that it had a high level of suspicion about the claim and a predisposition toward a negative outcome in the "investigation."

57.     Ms. Maitland reiterated that on a "great day" Ms. Hughes could walk 45 minutes, though she tries to walk 25 minutes a day. According to Ms. Maitland, Ms. Hughes reported that "at times" she can do laundry or sweep the floor, or do the dusting "if she is feeling better." "Sometimes" she gets outside and will pull some weeds.  "Sometimes" she can grill, and

"sometimes" she can mow the grass, in increments.

58.     Ms. Maitland next referred the case to a neurologist, Joseph Jares, M.D., for review. Dr. Jares did not examine Ms. Hughes. His conclusions are, by definition, limited to his paper review of the medical records, the surveillance evidence and Ms. Hughes' interview.

59.     Every treating provider whose records Dr. Jares reviewed confirmed that Ms. Hughes is totally disabled from performing any full-time work and that nothing in their records should be construed to the contrary.

60.     Dr. Jares reviewed the surveillance, and then asserted: "Pt may sit unrestricted. Stand up to 10 minutes at a time, up to one hour total in an 8 hour work shift.  Frequently carry 0-10 pounds occasionally. Should not bend, kneel, stoop, crouch, or crawl due to potential of exacerbating vertigo. No working at heights.  No driving or operating machinery for employment purposes. May work at computer 30 minutes -- then a 2-3 minute break."

61.     Dr. Jares did not explain how the three hours, total, of recorded activity taken from 18 hours of surveillance could support his conclusion, nor did he offer any reason to conclude Ms. Hughes was not credible in her complaints of bouts of total incapacitation.

62.     Hartford unilaterally terminated Ms. Hughes' benefits in a letter dated October 6, 2016, by Ms. Susan H. Peterson. (The Termination Letter). Hartford asserted, "*We have concluded from the combination of all the medical information in your file that you are able to perform sedentary occupations that allow you to take breaks from the computer screen every 30 minutes.*"

63.     Hartford had previously conceded that the evidence supported Ms. Hughes' disability from "Any Occupation" due to her vestibular disorder and migraines from November

24, 2014 through October 5, 2016.

64.     Hartford's termination of benefits was in the absence of any substantial evidence that Ms. Hughes' condition had improved significantly.

65.     Hartford's October 2016 termination of benefits ignored contemporaneous material evidence *dis*proving any significant improvement in Ms. Hughes' condition. For instance, a neurology visit dated July 28, 2016 (the most recent visit preceding termination), documented abnormal clinical findings and *severe* disability due to migraine. Neurology PA Brandy Hughes documented continued "control" of migraines with Botox, but with this additional context: "She estimates having 16 headache days in the last 90 days that confined her to bed. This is much better than baseline when she was having headaches essentially daily."  "Control" meant the headaches were no longer daily, but still confined Ms. Hughes to bed 16 days out of 90.

66.     At the same visit, PA Hughes noted that Ms. Hughes' migraine MIDAS (Migraine Disability Assessment Test) score was 46, more than double the cutoff for "severe disability" from migraines (anything above a score of 21).

67.     At a neurology visit on November 1, 2016, just 26 days after the termination decision, the neurologist noted, "Vertigo is unchanged, she thinks it may be a little worse because she is trying to do more lately." Moreover, on physical examination PA Brandy Hughes clinically observed and documented "gait unsteady, nystagmus." Her assessment was "migraine variant unchanged."

68.     At a November 9, 2016 visit with her vestibular therapist — just weeks after Hartford's termination – Ms. Hughes continued to have the same kind of objectively abnormal

balance tests as in the previous few years.

69. In December of 2016, Ms. Hughes retained counsel to assist her in preparing an appeal to Hartford's termination of her LTD benefits.

70. On March 28, 2017, Ms. Hughes, through her attorneys, provided Hartford with her administrative appeal of Hartford's decision to terminate her LTD benefits on October 6, 2016. ("The Appeal").

71. The Appeal included a 20-page letter from counsel presenting evidence and arguments, and several hundred pages of evidentiary exhibits.

72. The central theme of Ms. Hughes' Appeal was that Dr. Jares' analysis, the surveillance footage, and Hartford's decision all completely overlooked the central issue of this disability claim: Ms. Hughes condition does not *always* prevent physical activity. Sometimes she is able to perform short periods of light activity. She is symptomatic more days than she is not, often for hours at a time. When she is symptomatic, she is *totally incapacitated*. This happens so often that she is totally unreliable as an employee and therefore unemployable in any occupation.

73. In the Appeal, Ms. Hughes provided Hartford with proof that she has been Disabled at all relevant times within the meaning of the Policy and entitled to LTD benefits since the date benefits were terminated, and continuing.

74. In the Appeal, Ms. Hughes provided Hartford with extensive medical literature, confirming that her migraine and vestibular conditions are both medically plausible, commonly co-existing, and commonly disabling.

75. Ms. Hughes submitted a two-month headache journal to Hartford, which establishes in detail the frequency, severity, and duration of her disabling headaches. In January

2016, Ms. Hughes had incapacitating headaches 21 out of 31 days, most lasting four to twelve hours in duration. Ms. Hughes confirmed that these logs are representative of her life and symptoms on an ongoing basis.

76.     Ms. Hughes also submitted a detailed personal statement describing the frequency, severity and duration of her symptoms and how they unpredictably leave her incapacitated.

77.     Ms. Hughes also submitted corroborating witness statements from two lay witnesses and a medical narrative from Nurse Practitioner Brandy Hughes, all confirming that Ms. Hughes loved her job as a pediatric nurse and that she is not the type of person to exaggerate or fake a disability. All of them confirmed they have personally observed how frequent and debilitating Ms. Hughes' symptoms have been.

78.     Ms. Hughes submitted the transcript of a lengthy and detailed interview with vestibular expert and treating therapist Gaye Cronin confirming that Ms. Hughes has constant vestibular symptoms on a daily basis that vary only in intensity and duration.

79.     Dr. Cronin confirmed that once Ms. Hughes' symptoms are provoked, it becomes impossible for her to concentrate or be productive.  Her only option is to lie down and ride out the symptoms. Dr. Cronin confirmed that the symptoms are provoked by bright lights, motion, reading, and use of a computer, among other things.  These are all common triggers for vestibular patients.

80.     Dr. Cronin addressed the surveillance footage, and stated that Ms. Hughes is *encouraged* to be active when she is able. She also noted that Ms. Hughes moved slowly, and not normally, on the surveillance video because she has a balance problem. Dr. Cronin indicated that sometimes Ms. Hughes' gait is normal. Other times her gait is ataxic when she is symptomatic,

meaning she looks uncoordinated and only moves at a very slow pace.

81.     Dr. Cronin confirmed that the surveillance evidence in no way proves Ms. Hughes has lied or exaggerated, or that she is able to work.

82.     Given that it is impossible for Ms. Hughes to function *at all* – let alone sustain productive work activity – when she is symptomatic, Dr. Cronin reiterated that Ms. Hughes is unable to reliably and consistently perform any full-time job.

83.     Ms. Hughes provided the transcript of an interview with her ENT, Dr. Hoffmann, who opined that her practice also encourages balance and disequilibrium patients to be as active as possible.

84.     Dr. Hoffmann reiterated that walking with a slow deliberate gait does not mean Ms. Hughes is cured or capable of consistent productivity in a work setting.  Dr. Hoffmann confirms that just because Ms. Hughes can *sometimes* walk her dog for a short period of time, does not mean she can maintain a full-time job.

85.     Hartford, by taking Ms. Hughes' occasional, brief bouts of light activity out of context, is unfairly penalizing her for being a compliant patient.

86.     Both Dr. Cronin and Dr. Hoffman confirmed that Ms. Hughes has undergone objective vestibular testing during her treatment with them, including nystagmogram, audiogram and posturography tests, all of which consistently verified Ms. Hughes' vestibular disorder.

87.     A nystagmogram is an objective test in which a patient's eye and head movements are recorded by video goggles equipped with infared cameras.  Ms. Hughes' nystagmogram test revealed nystagmus, which is characterized by abnormal and jerky eye movements. Nystagmus is

an objective vestibular finding can neither be faked nor simulated.

88.    An audiogram is an objective test that measures hearing loss.  Ms. Hughes' audiogram revealed abnormal results, which is an objective vestibular finding that can neither be faked nor simulated.

89.    A posturography test is an objective standardized test that measures balance.  Ms. Hughes' posturography revealed abnormal results, which is an objective vestibular finding that can neither be faked nor simulated.

90.    Dr. Hoffmann also clarified the intent behind her notations of "improvement."  Dr. Hoffman confirms she only annotated the record to note that Ms. Hughes was showing some specific improvement while engaged in the vestibular rehabilitation group (Dr. Cronin), and that her balance had improved.  Dr. Hoffmann did <u>not</u> intend to suggest or imply that Ms. Hughes had recovered to a full-time work capacity.

91.    Dr. Hoffmann noted that while she rarely finds a patient completely disabled, Ms. Hughes is "one of her worst patients," and her problems are more complex and severe than most of Dr. Hoffmann's other patients. Consequently, Dr. Hoffmann failed to see how Ms. Hughes' complete disability status is "even debatable."

92.    After receiving Ms. Hughes' Appeal, Hartford notified Ms. Hughes' counsel of its intent to send her for an insurance medical examination ("IME") with a well-known defense-oriented neurologist, Dr. Schiff, on May 11, 2017.

93.    By letter dated April 18, 2017, Ms. Hughes' counsel notified Hartford of his concerns about Dr. Schiff's objectivity, and requested Hartford provide a copy of Dr. Schiff's report so that Ms. Hughes could exercise her right to respond.  Hartford refused to acknowledge

this request.

94.     On June 6, 2017, counsel for Ms. Hughes provided Hartford with an email from Ms. Hughes documenting her IME experience, in which Dr. Schiff behaved somewhat hostilely toward her.

95.     Weeks came and went without Ms. Hughes receiving a copy of Dr. Schmidt's report.  On June 27, 2017, counsel for Ms. Hughes sent Hartford a second letter demanding a copy of Dr. Schiff's IME report so she could respond. Hartford also ignored Ms. Hughes' second request.

96.     On June 29, 2017, Hartford wrote a letter upholding its termination of Ms. Hughes' LTD benefits – without ever providing Ms. Hughes the opportunity to respond to Dr. Schiff's insurance medical examination report. ("the 2017 Appeal Decision").

97.     Following Hartford's decision, Ms. Hughes learned that Hartford purposely withheld Ms. Hughes' most important evidence from Dr. Schiff supporting her claim. Specifically, Hartford withheld: (a) Ms. Hughes' two months of daily symptoms diaries establishing the exact frequency, duration and severity of her disabling symptoms; (b) her own personal detailed statement; (c) all of her eyewitness statements; and (d) the two detailed expert witness interviews from Dr. Cronin and Dr. Hoffman. Dr. Schiff did not have access to this evidence in forming his opinions – rendering his opinion incomplete, unreliable, and lacking appropriate foundation.

98.     Dr. Schiff was the only medical professional Hartford consulted during the 2017 appeal. By excluding and withholding Ms. Hughes' critical material evidence from Dr. Schiff, Hartford failed to undertake a review that considered all the evidence as required under ERISA.

99.     It was only after Harford denied the 2017 Appeal that Hartford provided Ms.

Hughes a copy of Dr. Schiff's report. The report also confirmed a cursory neurological examination. Upon review of the report, Dr. Schiff failed to administer *any* objective vestibular tests.

100.    Dr. Schiff's examination was careless, biased or both.  It does not constitute substantial evidence sufficient to rebut the substantial body of reliable evidence confirming Ms. Hughes' total disability.

101.    Hartford intentionally "sandbagged" Ms. Hughes with Dr. Schiff's report, seeking to close the record without giving her, her doctors, or her attorney an opportunity to respond. This Court previously found this to be a violation of the "full and fair review" guaranteed by ERISA.

## The First Lawsuit and Recent Remand

102.    Plaintiff hereby repeats and realleges the allegations of Paragraphs 1 through 101 above, as if set forth verbatim herein.

103.    On September 18, 2017 Ms. Hughes' filed her first lawsuit against Hartford.  The case concluded with an order from this Court finding that Hartford violated "full and fair review" by sandbagging Ms. Hughes' with Dr. Schiff's report.  The Court remanded the claim to Hartford to conduct a "full and fair review" of the claim.

104.    The parties reached an agreement to treat the remand as an additional appeal. Ms. Hughes' counsel wrote, "It would be our contention and hope that Hartford would agree to abide by the regulations applicable to appeals, and that it would act consistently with the judge's order, which means giving a (timely) chance to review and respond to any new consultant reports.  It is also important to us that Hartford not sanitize or cherry pick what it sends to its consultants as occurred with Dr. Schiff." (*See* email exchange between counsel attached as Exhibit B.)

105.    On May 30, 2019, Ms. Hughes submitted the information she wanted Hartford to consider on remand. This included, among other things: (a) a 33 page, single-spaced cover letter setting forth her position; (b) all of her previous evidence from the 2017 Appeal; (c) detailed affidavits from her treating physicians and others responding to Dr. Schiff's IME; (d) multiple updated witness statements; (e) relevant medical literature; (f) updated medical records; (g) and a report from a vocational expert certifying Ms. Hughes' total unemployability.

106.    In her remand submission, Ms. Hughes' made two very specific requests to Hartford, consistent with her rights under ERISA's regulatory requirements.  These requests included:

- *"Engage in a proper dialog with us. That means giving us the right to review and respond to your consultants before you make your decision and doing so sufficiently early to enable us to comment and still receive a timely decision."*
- *"Make a timely decision. 45 days, plus a 45-day extension, but only for special circumstances beyond your control. Beyond your control does not, in our view, mean taking the first 45 days to find an expert."*

107.    Hartford received the remand request on June 3, 2019.  Its appeal decision was due no later than September 1, 2019.

108.    On August 1, 2019, 60 days into its review period and 30 days before its decision deadline, Hartford sent a letter to Ms. Hughes including two new medical consulting reports. Neither consultant had examined Ms. Hughes. Both based their opinions on a review of records, and both asserted Ms. Hughes has had the ability to perform full time sedentary work restricted only from working at heights, an assertion at odds with the great weight of Ms. Hughes' evidence.

109.    Hartford allotted Ms. Hughes 21 days to respond to these remand consultant reports. In the same breath, Hartford claimed the right to toll its own deadlines during the time Ms.

Hughes was responding. Hartford made no reference to any ERISA claim regulation(s) or plan provisions giving Hartford the right to toll its deadlines.

110.    Hartford's request for tolling was and is at odds with the United States Department of Labor's ERISA claim regulations.

111.    On August 15, 2019, Ms. Hughes sent an 8-page letter pointing out the unreliability and signs of basis in Hartford's remand consultant reports.

112.    The August 15, 2019 letter also reaffirmed that Hartford's decision deadline should expire on the 90th day after receipt of the remand submission, or September 1, 2019. Ms. Hughes also noted, "In the event Hartford seeks any additional opinions not already shared with us, please ensure we have an opportunity to respond to those, too, before making a final decision. Again, this will not toll your deadline, as noted above. We do not want to be sandbagged by new rationales contained in your claim file which we only learn about after the administrative process has closed."

113.    Hartford went back to its same two remand consultants to allow them to defend their earlier conclusions. By letter dated August 28, 2019, Hartford sent Ms. Hughes a letter including its medical consultants' *addenda* responses (to her August 15, 2019 response to their initial reports).  Predictably, both remand consultants doubled down on their previous opinions and assertions.

114.    Rather than simply providing Ms. Hughes her right to respond to the remand consultant addenda, as ERISA *obligated* Hartford to do, Hartford threatened to preclude Ms. Hughes from exercising her right unless she submitted to certain conditional demands. Specifically, Hartford insisted that it would only allow Ms. Hughes to respond *if she agreed to toll Hartford's decision deadlines* – effectively holding her rights hostage. Hartford's *quid pro quo*

threat flies in the face of ERISA at its core, and directly violates this Court's Order for remand.

115.    On the morning of August 30, 2019, at 9:54 a.m., Ms. Hughes' attorney called and reached Hartford's claim handler, Hally Rupert, advising her that "we would be sending a brief response to the latest addenda of your two latest medical consultants.  I confirmed we would agree to extend your appeal decision deadline to September 8, 2019 to allow you to consider our response." (See letter of August 30, 2019, attached as Exhibit C).

116.    In other words, Ms. Hughes did agree to a limited extension for Hartford's decision even though ERISA claims regulations did not require her to do so.

117.    At 12:22 p.m. that same day, Ms. Rupert called back pressuring Ms. Hughes to submit to Hartford's full extension demand (to September 16, 2019, or 15 days past its decision deadlines) so that Hartford could go back to these same remand consultants and allow them to respond to Ms. Hughes' response to their addenda to their original reports.

118.    Ms. Hughes counsel communicated that, "not only is this getting absurdly repetitive, we do not feel it is appropriate for Hartford to insist on giving the last word to two consultants so clearly entrenched in their positions." When Ms. Hughes' counsel refused to submit to Hartford's unreasonable and inappropriate demands, the conversation concluded there.  (See Exhibit C).

119.    Ms. Rupert did <u>not</u> mention in the phone call what would happen next.  When Ms. Hughes did not agree to the additional 8 days extension (beyond what she had already agreed), less than an hour later Hartford sent a 10-page, single spaced denial letter upholding termination of benefits ("The Remand Uphold").

120.    In the Remand Uphold Letter, Hartford mechanically and uncritically parroted the

conclusions of its remand consultants and disregarded Ms. Hughes' material evidence – all without any attempt to weigh the quality or quantity of the conflicting evidence.

121.    Hartford sent its Remand Uphold letter *knowing* that Ms. Hughes was going to respond to the remand consultant addenda, because counsel had told them as much at 9:54 a.m. (see paragraph 115) above. Hartford's motive here was transparent – to once again cut off the administrative process, giving itself the last word and *intentionally* denying Ms. Hughes the chance to respond to its latest consultant rationales.

122.    Immediately after the above phone call and upon receiving the Remand Uphold Letter, Ms. Hughes' sent her response to the consultant's addenda to Hartford by facsimile, requesting they re-review the matter and decide the claim by September 8, 2019. (See second letter of August 8, 2019, attached as Exhibit D).

123.    Hartford has possessed Ms. Hughes' response to the remand consultant addenda for more than a month as of this filing. Hartford has (once again) completely refused to acknowledge Ms. Hughes' final attempt to engage in a dialog about the evidence – turning a blind eye to Ms. Hughes' response in attempt to give itself the "last word."

124.    By its Remand Uphold and related actions, Hartford has engaged in precisely the conduct which this Court found to be a violation of "full and fair review" in the first lawsuit.

125.    Upon information and belief, Hartford's Remand Uphold Letter was finalized before the phone call with counsel even took place. Despite knowing of its existence, Hartford kept secret that its decision was already written when requesting its additional extension. In many, many ways throughout the life of this claim Hartford has intentionally played games designed to disadvantage Ms. Hughes–*consistently* behaving like an adversary, rather than a fiduciary, in the

claims process.

126.    The remand process has now been exhausted, and Hartford still refuses to pay additional benefits.

127.    Hartford continues to behave in ways inconsistent with ERISA's guarantee of a full and fair review, including again trying to sandbag Ms. Hughes by preventing a response to the remand consultant addenda reports while simultaneously relying heavily on those reports for its final decision.

128.    Based on Hartford's current and past violation(s) of full and fair review, this Court should review the merits of Ms. Hughes' disability claim under the *de novo* standard.

## COUNT I: BENEFITS DUE UNDER 29 U.S.C. § 1132(a)(1)(B)

129.    Plaintiff hereby repeats and realleges the allegations of Paragraphs 1 through 128 above, as if set forth verbatim herein.

130.    Defendant Hartford's refusal to pay LTD benefits beyond October 5, 2016 is wrong, unreasonable, violates the terms of the Policy, and is completely contrary to the weight of credible evidence in its file.

131.    Ms. Hughes is entitled to LTD benefits under the Plan retroactive to October 6, 2016 and continuing through the date of this Court's final judgment.

132.    Ms. Hughes is further entitled to interest on all past due amounts pursuant to ERISA 29 U.S.C. § 1132(a)(1)(B).

133.    Plaintiff has retained counsel to represent her in this matter, and is entitled to an award of costs, including a reasonable attorney's fee, pursuant to ERISA 29 U.S.C. § 1132(g)(1).

134.    WHEREFORE, Ms. Hughes prays for relief in the following forms:

a)  An order finding Defendant's termination of Plaintiff's benefits was *de novo* wrong and/or an abuse of discretion;

b)  An award of long-term disability benefits retroactive to October 6, 2016, and continuing through the date of this Court's judgment, plus prejudgment interest and Plaintiff's reasonable expenses of litigation, including a reasonable attorney's fee;

c)  A clarification of Plaintiff's rights ordering Hartford to continue paying disability benefits unless and until she actually returns to work or unless there is evidence of improvement of Plaintiff's medical condition(s) establishing that she can reliably and consistently resume full time work in "*any occupation for which  [she is] qualified by education, training or experience, and that has an earnings potential*" as defined in the Plan*; and*

d)  Such other and further relief as the Court may deem just and proper.

Dated:  October 14, 2019

RIEMER & ASSOCIATES LLC
Attorneys for Plaintiff
275 Madison Ave., 26th Floor
New York, New York 10016
P: (212) 297-0700
F: 212-297-0730
sriemer@riemerlawfirm.com

By:    *s/ Scott M. Riemer*
          Scott M. Riemer (SR 5005)