## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

PATRICIA HUGHES,
    *Plaintiff*,

    v.

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,
    *Defendant*.

No. 3:19-cv-01611 (JAM)

## MEMORANDUM OF DECISION

This case concerns the denial of a claimant's benefits under a long-term disability plan.

Plaintiff Patricia Hughes suffers from migraine headaches and vertigo. The defendant Hartford

Life and Accident Insurance Company ("Hartford") paid long-term disability benefits from 2012

to 2016 before deciding that Hughes was no longer disabled.

Hughes now seeks judicial review of Hartford's denial of benefits pursuant to the

Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132(a) ("ERISA"). The parties

have filed cross-motions for summary judgment and have agreed to a bench trial with findings of

fact and conclusions of law on the basis of their respective submissions.

In summary, I conclude that Hartford did not violate Hughes's right to a full and fair

review with respect to its most recent decision on administrative appeal of her disability claim.

On that basis, I conclude that Hartford's appeal decision denying benefits should not be subject

to *de novo* review. Instead, the appeal decision should be subject to review only for whether it

was arbitrary or capricious. Applying that deferential standard of review, I am persuaded that

there is substantial evidence for Hartford's decision and that Hartford did not engage in any

material error of law. Accordingly, I will enter judgment in favor of Hartford.

1

**BACKGROUND**

This is the second time that the parties have been before me, and the basic background of this case is set forth in my prior decision. *See Hughes v. Hartford Life and Accident Ins. Co.*, 368 F. Supp. 3d 386 (D. Conn. 2019).

### *Hughes's initial disability and claim*

Hughes worked as a registered nurse at Children's Healthcare of Atlanta in Georgia. *Id.* at 389. Beginning in January 2011, she was treated by a specialist, Dr. Karen Hoffmann, for vertigo and Meniere's disease (an inner ear disorder causing vertigo). *Ibid.* Hughes's condition progressively worsened as documented by Dr. Hoffmann until late 2012, when she suffered constant dizziness and disequilibrium and was reported as unable to walk, drive, or work. *Ibid.*

Hartford administers and insures the disability benefit plan under which Hughes received coverage through her employer. *Ibid.* Hartford approved Hughes's claim for disability and began paying benefits as of November 2012. *Ibid.*

Hughes briefly returned to part-time work (two hours per day) in early 2013 but stopped by March 2013. *Ibid.* She continued to experience setbacks including multiple migraine headaches for which she saw numerous medical specialists through 2013 and 2014. *Ibid.* In 2014, she got into two car accidents when she drove into the cars in front of her. Her doctors attributed the accidents to insomnia and vertigo. *Ibid.* That same year, she reported to Hartford that her headaches had decreased to approximately three per month. *Ibid.*

Hartford decided to engage in covert video surveillance of Hughes in April 2016. She was seen walking her dog, engaging in yard work, and gardening for about an hour. *Ibid.* Hartford then interviewed Hughes in May 2016, and it forwarded the surveillance footage to Dr. Hoffmann to seek a further opinion. Hartford also consulted Hughes's neurologist, psychiatrist,

chiropractor, and vestibular therapist, and it sent the footage and Hughes's file to the Medical Consultants Network for an independent medical evaluation, which was conducted by neurologist Joseph Jares. *Ibid.*

When asked if Hughes was capable of "activity for 40 hours a week: primarily seated with some standing/walking throughout the day," along with some carrying limitations and the opportunity to change positions as needed, Dr. Hoffmann responded that she was. *Ibid.* However, she noted that Hughes "will not be able to drive when she is having vertigo," and that reading and using the computer for long periods of time continue to cause Hughes "disequilibrium and dizziness." *Ibid.*

Dr. Hoffmann later clarified her response in an interview with Hughes's attorney, which was submitted to Hartford on appeal. Dr. Hoffmann stated that while she had noted some improvement in Hughes's condition in 2016, she "didn't feel that [Hughes] was able to improve enough to go back to work." *Ibid.*

Hartford asked Hughes's other providers if they recommended any activity limitations stemming from the conditions they were treating. *Id.* at 390. Hughes's neurologist checked the "no" box in response, adding that Hughes "can't bend over frequently" and needs breaks throughout the day. *Ibid.* Her psychiatrist also checked "no" and added that Hughes is "physically limited and secondarily limited" by the depression that stems from her physical problems. *Ibid.* Her chiropractor did not suggest any activity limitations, but he noted that he had not seen her in several months. *Ibid.* Her vestibular therapist checked "yes," noting that Hughes required the following limitations: "limited reaching, turning, lifting/carrying, head movements, bending, climbing, balancing, eye movements, pushing/pulling, walking on uneven surfaces, operating machinery." *Ibid.*

3

Hartford interviewed Hughes on May 12, 2016. *Ibid.* According to the interviewer's notes, Hughes reported being able to shop at a large store, although she said that the noise sometimes exacerbates her symptoms and that her partner usually accompanies her to the store. *Ibid.* She said she could walk up and down stairs but only at a slow pace using the rail. *Ibid.* She reported traveling from Georgia to Indiana for a family event but said the noise and movement in the airport caused her symptoms to resurface, requiring the use of a wheelchair. *Ibid.* She said she believed she would "be able to return to work at some time." *Ibid.*

Dr. Jares also issued a report. He did not dispute that Hughes suffered from a vestibular disorder, but he stated that, based on his observation of the surveillance footage, "she could sit without restriction; stand and walk for up to an hour per day; and use a computer for up to eight hours a day, but for no more than thirty minutes at a time with a two-to-three minute break." *Ibid.*

Hartford terminated Hughes's benefits on October 6, 2016. *Ibid.* On March 28, 2017, Hughes filed an administrative appeal of the decision, arguing that Hartford had misconstrued her medical records and the surveillance footage and fundamentally misunderstood the nature of her disability. She wrote that her symptoms "frequently and unpredictably render her incapable of any productive activity, at work or at home," such that "it is impossible for her to reliably and consistently perform the tasks required of any full-time employee." *Ibid.* While on some days she can engage in activities like walking her dog, gardening, or reading, on bad days she has "no tolerance for any activities and may be in bed all day." *Ibid.*

The appeals unit at Hartford forwarded almost all of the records in her file to the Medical Consultants Network for an independent medical evaluation, with directions for the reviewer to "comment on [Hughes's] overall functionality" and to consider her objective complaints, "the

impact of her medications on her ability to function in the workplace," and her ability to sustain work on a consistent basis. *Ibid.* Dr. Arthur Schiff, a neurologist, was assigned to the case. *Ibid.*

On April 25, 2017, Hartford wrote a letter to Hughes advising her that it had scheduled an appointment for her to be examined by Dr. Schiff on May 11, 2017. *Ibid.* The letter advised that Dr. Schiff would send a report of his examination to Hartford. *Ibid.*

After examining Hughes and reviewing her file, Dr. Schiff sent a report to Hartford on May 23, 2017. *Ibid.* On the basis of various neurological tests, Dr. Schiff concluded that the results were normal. *Ibid.* He concluded that Hughes suffered from tinnitus, dizziness, and giddiness, and that her diagnosis of vestibular dysfunction was inconsistent with the normal results of her neurological examinations and the physical movements observed in person and in the surveillance footage. *Ibid.*

Hughes asked Hartford for a copy of Dr. Schiff's report so that she could respond to it before Hartford ruled on her claim. *Ibid.* But Hartford did not send her the report. *Ibid.*

Hartford then denied Hughes's appeal on June 29, 2017. The appeal denial letter relied in part on Dr. Schiff's report. *Ibid.* Only after denying her appeal did Hartford give Hughes a copy of Dr. Schiff's report. *Ibid.*

### *Initial court decision remanding for Hartford to conduct a full and fair review*

Hughes filed for review by this Court as permitted under ERISA § 502(a), 29 U.S.C. § 1132(a). I did not address the merits of Hughes's appeal but ruled instead that Hartford had failed to afford Hughes a full and fair review in compliance with the procedural requirements of the then-applicable version of 29 C.F.R. § 2560.503-1.

I concluded in relevant part that Hartford wrongly relied on Dr. Schiff's report that it procured without affording Hughes an opportunity to review or respond to the report before

Hartford rendered its decision. As I noted, "the 'persistent core requirements' of full and fair review include 'knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of that evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision.'" 368 F. Supp. 3d at 393 (quoting *Halpin v. W.W. Grainger*, 962 F.2d 685, 689 (7th Cir. 1992)). After detailing at length how Hartford's reliance on the undisclosed report contravened the text of the federal regulations, I explained that "[n]o common sense notion of what it means to have a full and fair review can be squared with a review process that denies a claimant access to key information that will be the very basis for a health or disability plan to deny benefits," and that "[f]ull and fair review suggests a review that is thorough, comprehensive, and transparent—not one in which a plan may order up a doctor's report at the final hour and then deny the claimant access to this information until it is too late for the claimant to respond." *Id.* at 397. The case was remanded to Hartford to conduct a full and fair review of Hughes's claim. *Id.* at 403.

### The second administrative appeal

The parties agreed to treat the review on remand as a second administrative appeal. Doc. #56 at 21. Hughes submitted her appeal on May 30, 2019. *Ibid.* Under the relevant regulations, Hartford's deadline to decide the appeal was September 1, 2019. *Ibid.* Hartford sought the review of two independent doctors—Dr. Eric Slattery and Dr. Arousiak Varpetian Maraian—a neurotologist and a neurologist, respectively. Doc. #57-1 at 20.

On August 1, 2019, Hartford sent these doctors' reports to Hughes's counsel, noting that it would allow Hughes "a reasonable opportunity to respond before we make our final decision," and requesting that Hughes notify Hartford if Hughes did not wish to respond; otherwise,

Hartford would wait 21 days for Hughes to respond. AR2524.[1] Hughes's counsel responded, stating that "we stand on the evidence submitted in support of [Hughes's] current appeal. Hartford's task at this point is to weigh the conflicting evidence and determine whether Ms. Hughes is capable of working based on the preponderance of the most credible evidence," and providing argument regarding Dr. Slattery and Dr. Maraian's reviews. AR2597-604. Hughes's counsel also did not agree to toll the decision deadline and maintained that the deadline would be "the 90th day following your receipt of Ms. Hughes's remand appeal," that is, September 1, 2019. AR2604.

Hartford took Hughes's response and gave it to Dr. Slattery and Dr. Maraian, who responded with addenda reports that Hartford received on August 26, 2019. Doc. #57-1 at 24; AR2583-85; AR2591-93. Hartford then sent these addenda to Hughes's counsel on August 28, 2019. Doc. #57-1 at 26. Hartford wrote that if Hughes wanted to submit additional information in response to the addenda, "it will not be considered as part of the final determination unless we can reach a mutually agreeable position about extending the appeal review period beyond 9/1/2019 in order to provide a reasonable amount of time for review." AR2527.

Hughes's counsel called Hartford on August 30, 2019, and stated that he intended to submit more evidence including updated statements and a video on September 3, 2019, but that he was not willing to extend the deadline for decision beyond September 8, 2019. Doc. #57-1 at 26; AR2555. Hartford called Hughes's counsel back that same day and asked for an extension to September 16, 2019, so that it would have time to submit Hughes's new evidence to Dr. Slattery and Dr. Maraian for their evaluation. Doc. #57-1 at 26; AR2465; AR2555. Hartford asserts that

---

[1] All citations to the Administrative Record submitted in this case will be cited as "ARXXXX." The Administrative Record appears on the docket at Doc. #63.

because a decision on the extension for the deadline was not reached, it issued its decision later

that day on August 30, 2019, two days before the September 1 deadline. Doc. #57-1 at 26.

Hartford's decision was issued in the form of an 11-page single-space letter signed by an

appeal specialist. AR2528-38. The decision letter noted at the outset that Hartford's decision was

based on "all documents contained in Ms. Hughes' claim file, viewed as a whole." AR2529. The

first several pages of the decision letter catalogued and reviewed the evidence submitted by

Hughes as well as her contentions about what the evidence showed—including her contention

that she suffered episodic incapacitation due to her vestibular condition that prevented her from

working. AR2529-31. The decision letter then turned to discuss the findings and conclusions of

Dr. Slattery that Hughes's primary condition was due to vestibular migraine headaches (as

distinct from vestibular dysfunction) and of Dr. Maraian that the migraine headaches were not of

sufficient intensity to prevent Hughes from working. AR2531-35.

In particular, Dr. Slattery's report (as quoted in the decision letter) stated that Hughes had

initially shown symptoms in 2012 of "acute, uncompensated vestibular weakness" but that these

symptoms were no longer the "prevalent complaints" by 2013 and that "vestibular migraine

appears to be the primary problem." AR2531. Dr. Slattery noted that "[t]ypical symptoms of

chronic vestibular dysfunction" were "not clearly delineated in this claimant's history after

2013." AR2532. After reviewing Hughes's response to his initial report, Dr. Slattery

acknowledged that "there are some signs and test results that can be attributed to the peripheral

vestibular system presented in the data" but that "these are not all conclusive of a peripheral

vestibular dysfunction that is continued in an uncompensated fashion." *Ibid.*; *see also* AR2534

(noting Dr. Slattery's opinion that "after 2013, the symptoms are consistent with vestibular

migraine and he does not see any evidence that there is peripheral vestibulopathy as of 2016").

Dr. Maraian's report (as quoted in the decision letter) focused on the effects of Hughes's migraines. She stated in part on the basis of treatment records that as of October 2016 Hughes had undergone treatment including Botox injections at three-to-five month intervals and that Hughes "reported intermittent migraines improved with the injections." AR2533. She further noted there was "no documentation that the claimant required hospitalization or urgent treatment in the ED for uncontrolled headaches." *Ibid.* As to the contrary views of one of Hughes's treating physicians (Dr. Hoffmann), the decision letter cited Dr. Maraian's view that "this statement reflects the doctor's opinion which is not supported by the doctor's records," and that "[t]here are no records demonstrating uncontrolled symptoms which required urgent treatment or ED evaluation." *Ibid.*

According to the decision letter, "[b]ecause of balance difficulty, Dr. Maraian identified some restrictions but stated there was no evidence that the condition causes total functional impairment." AR2534. Notwithstanding Hughes's claims of "being in bed with incapacitating headaches," Dr. Maraian acknowledged these self-reports but noted that "[t]he records from the providers did not document such debilitating pain observed during any of the visits." *Ibid.*

In addition, Dr. Maraian relied on the lack of aggressive treatment for Hughes's condition. According to the decision letter, "Dr. Maraian pointed out that typically, if a patient is unable to tolerate severe pain, he or she would seek treatment for it. There is no evidence that this was the case for Ms. Hughes, according to the documentation provided." *Ibid.*

Dr. Maraian also pointed to evidence of improvement in Hughes's condition by October 2016 and afterwards: "Dr. Maraian also stated in response to your letter stating that the claimant was bedridden 16 out of 90 days with headaches, 'This complaint was made during a clinic visit

on 7/28/16. During the next clinic visit in Neurology on 11/1/16 the claimant reported that her migraines were getting better.'" *Ibid.*

After completing its review of the opinions of Dr. Slattery and Dr. Maraian, the decision letter identified seven different widely available occupations—such as nurse, research assistant, cardiac monitor technician, and assignment, formula, or repair-order clerk—that "are within Ms. Hughes' work and educational history and do not require working at unprotected heights or with heavy machinery." AR2535. "Following a comprehensive appeal review, we find that the weight of the evidence does not support that Ms. Hughes is totally incapacitated by her symptoms/medical conditions." AR2536.

The decision letter further noted that it had considered the fact that Hughes had been approved for disability benefits by the Social Security Administration ("SSA"). It explained, however, that "[i]t is possible to qualify for SSD [Social Security disability benefits] but no longer continue to qualify for private LTD [long term disability] benefits from The Hartford." *Ibid.* Thus, according to the decision letter, "while The Hartford considers the SSA's disability determination as one piece of relevant evidence, the SSA's determination is not conclusive." AR2537.

The decision letter further stated that "our decision included more recent medical information than that used by the SSA to make their decision and a vocational analysis of Ms. Hughes' transferable skills that identified multiple occupations that she can perform in light of her medical conditions and associated restrictions/limitations." *Ibid.* It added as well that "[t]he SSA determination dated 3/14/16 noted that the doctors and trained personnel that decided your client was disabled according to the SSA rules expected her health to improve and therefore would be re-evaluating her case in 2018." *Ibid.* "Therefore, while we note that your client was

approved for SSD benefits in March of 2016, we find the medical evidence does not support that your client continued to meet the definition of disability under the LTD policy beyond 10/5/2016." *Ibid.*

Hughes once again filed a complaint in this Court seeking judicial review. In addition to the administrative record, I have also considered the parties' many submissions as filed on the docket, and I conducted a three-hour hearing with counsel on December 9, 2020. Doc. #72.

## DISCUSSION

Although the parties have styled their moving papers as cross-motions for summary judgment, they have agreed to a bench trial and to my adjudication of the disputed issues on the basis of the papers they have submitted. Doc. #21 at 9; *O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 642 F.3d 110, 116 (2d Cir. 2011). Accordingly, this ruling constitutes explicit findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

I will first address what standard of review I should apply in my evaluation of Hartford's most recent appeal decision. Then I will address the merits of the decision in light of the applicable standard of review.

### A.  Standard of review

A court reviews a plan administrator's denial of benefits *de novo* unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, in which case an arbitrary and capricious standard applies. But even when the plan confers such discretion, a court reviews *de novo* those cases in which a plan administrator fails to comply with the Department of Labor's claims procedure regulations, unless the failure to do so was inadvertent and harmless. *See In re DeRogatis*, 904 F.3d 174, 187

(2d Cir. 2018); *Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ.*, 819 F.3d 42, 51, 58 (2d Cir. 2016).

Here, the plan at issue states that it "has granted [Hartford] full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy." AR28. Accordingly, absent a showing that Hartford failed to follow the claims procedure regulations, I must apply a deferential abuse-of-discretion standard of review.

Hughes advances several arguments why I should apply *de novo* review. I will address each one in turn.

### 1. *Prior denial of full and fair review on first administrative appeal*

Hughes argues that *de novo* review must apply because of my prior ruling that Hartford failed to conduct a full and fair review during the course of the first administrative appeal. But the Supreme Court's decision in *Conkright v. Frommert*, 559 U.S. 506 (2010) forecloses this argument. In *Conkright*, the plan administrator for an ERISA plan initially interpreted and applied the plan in a particular way that a federal court found to be error. Following remand to the plan administrator and a renewed round of judicial review, the lower courts declined to apply deferential review to the plan administrator's determinations. *Id.* at 510-11. In effect, the lower courts "crafted an exception" to the usual rule of deference—that a court "need not apply a deferential standard where the administrator has previously construed the same plan terms and … found such a construction to have violated ERISA." *Id.* at 512-13 (internal quotations and brackets omitted).

But the Supreme Court rejected this "one-strike-and-you're-out" approach in light of the manifest reasons why courts ordinarily apply a deferential standard of judicial review. *Id.* at 513-19. Thus, the Supreme Court held that "[t]he Court of Appeals erred in holding that the District

Court could refuse to defer to the Plan Administrator's interpretation of the Plan on remand, simply because the Court of Appeals had found a previous related interpretation by the Administrator to be invalid." *Id.* at 522.

The same reasoning applies here. It precludes me from ruling that, because Hartford initially failed to conduct a full and fair review during the first administrative appeal, Hartford's determination of the second administrative appeal must therefore be subject to *de novo* review. *See also Kruk v. Metro. Life Ins. Co., Inc.*, 567 F. App'x 17, 19 (2d Cir. 2014) (following *Conkright* and concluding that "the review errors identified by [the initial district court decision] were corrected by expansion of the record on remand, and the record here fails to demonstrate the sort of systemic misconduct by plan administrators that might warrant a departure from the usual standard of deferential review of discretionary decisions," such as "[m]ultiple erroneous interpretations of the same plan provision" or "failure to act honestly and fairly").

The Second Circuit's decision in *Halo* is distinguishable. *Halo* allowed for *de novo* judicial review of determinations that were made by the plan administrator in violation of regulatory procedural requirements. 819 F.3d at 57-58. Here, by contrast, judicial review takes place—as in *Conkright* and *Kruk*—in a different procedural context: after the claim has been remanded for prior procedural error and after the plan administrator has conducted a re-determination free from the procedural violation that necessitated the remand. Hughes similarly misplaces her reliance on *Schuman v. Aetna Life Ins. Co.*, 2019 WL 2991958 (D. Conn. 2019), which applied *de novo* review but without reference to whether *de novo* review was warranted in light of the Supreme Court's decision in *Conkright*.

### 2. *Alleged denial of Hughes's right to present evidence*

Hughes next argues that *de novo* review should apply because Hartford once again failed to afford her a full and fair review even after remand. Hughes argues that Hartford issued its decision on remand before she was able to submit her supplemental evidence in response to Hartford's consultants' medical reports, and she argues that this failure amounted to a denial of a full and fair review in the same manner that I found Hartford erred in my prior decision.

I do not agree. On remand Hartford sought the opinions of two new experts—Dr. Slattery and Dr. Maraian—and it sent the reports to Hughes's counsel with an invitation to file a response. Hughes submitted an argument response to these reports but without submitting new evidence and disclaiming the need to do so. The two doctors in turn issued addenda replying to Hughes's response, and Hartford in turn sent these addenda to Hughes.

It was at *this* point, only two days before the deadline for Hartford to issue a decision, that Hughes stated an intention to submit new evidence while also refusing to extend the deadline for Hartford's decision any longer than a week. Hughes would have allowed Hartford only five days—from September 3, 2019, when Hughes's counsel stated he would submit the new evidence, to September 8, 2019, his proposed deadline extension—to consider new medical evidence that Hughes appears to have already had in her possession but chose not to submit earlier in the appeal process or when first invited to respond to the initial reports of Dr. Slattery and Dr. Maraian.[2]

The record suggests that it was now Hughes—not Hartford—who decided to engage in gamesmanship. Hughes insisted in essence on having the proverbial last word with new evidence

---

[2] Hughes sought in part to rely on a video. While Hughes's counsel does not give a date for the video footage of Hughes's eyes purportedly demonstrating the condition of nystagmus, the video itself, submitted as Exhibit 5A to Hughes's motion for summary judgment, appears to have been recorded on May 10, 2019. Doc. #56, Ex. 5A.

before Hartford made its decision and without allowing enough time for Hartford to obtain a medical expert response before issuing its decision. Hughes has not shown that Hartford concealed any evidence from her, that she was prevented from submitting evidence, or that Hartford's choice to render a timely decision before the long agreed-upon deadline denied her a full and fair review.

### 3.   *Alleged failure to show compliance with additional regulatory requirements*

Hughes next argues for *de novo* review on the alleged ground that Hartford failed to maintain and comply with procedures that ensure that reviewing physicians are qualified and impartial and to ensure that similarly situated claimants are treated the same. Hughes bases this argument on her claim that there are no documents in the administrative record to demonstrate Hartford's compliance with the relevant regulatory requirements or any internal procedures or guidelines relied upon by Hartford in making its determination, even though such documents were allegedly ordered to be produced by U.S. Magistrate Judge Farrish by means of a discovery order. Doc. #56 at 27-28.

But in making this argument, Hughes misunderstands Judge Farrish's order in which he stated that he would generally deny Hughes's request for production of "claims manuals, guidelines, or policies used or consulted in the adjudication of [her] claim or appeal" insofar as Hughes wished to "explore whether Hartford complied with 'the spirit and letter of' the regulation requiring a 'full and fair review' during the appeals process." Doc. #47 at 24. Judge Farrish noted that it is well-settled that "an ERISA claimant may not obtain extra-record discovery merely by claiming a need to confirm that she was fairly dealt with." *Ibid.*

Judge Farrish also ruled that Hughes was entitled under 29 C.F.R. 2560-503.1(j)(3) to copies of "all documents, records and other information relevant to" her claim for benefits. *Id.* at 24-25. The regulation in turn defines "relevant" documents to include any document that:

> (i) Was relied upon in making the benefit determination; (ii) Was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record or other information was relied upon in making the benefit determination; (iii) Demonstrates compliance with the administrative processes and safeguards required pursuant to [29 C.F.R. § 2560-503.1(b)(5)] in making the benefit determination; or (iv) In the case of a group health plan or a plan providing disability benefits, constitutes a statement of policy or guidance with respect to the plan concerning the denied treatment option or benefit for the claimant's diagnosis, without regard to whether such advice or statement was relied upon in making the benefit determination.

29 C.F.R. § 2560-503.1(m)(8). As Judge Farrish noted, this regulation does not "require production of every company rule or guideline, however unrelated to Hughes's claim," and he granted Hughes's motion to compel only to "the extent that the [requests for production] inquire after documents that are subject to disclosure under 29 C.F.R. §§ 2560.503-1(j)(3) and –(m)(8)." Doc. #47 at 26-27. Hartford ultimately responded that it did not have any "document[s] external to the Administrative Record that evaluated the extent to which Hartford Life complied with its administrative processes and safeguards in making the determination at issue." Doc. #56, Ex. 7 at 3.

Based on the language of the regulation and Judge Farrish's order, it is clear that there is a meaningful difference between the guidelines and rules themselves, and any documents that demonstrate compliance with those guidelines or rules, such as an audit. Further, the fact that these documents were not included in Hartford's response does not mean, as Hughes argues, that Hartford has no established procedures and that Hartford therefore failed to comply with

ERISA's regulations. Hughes has not otherwise shown grounds to conclude that Hartford did not retain medical experts who were qualified and impartial.

### 4. *Alleged failure to properly consider Social Security disability*

Hughes next argues that Hartford denied her a full and fair review "by failing to meaningfully consider the Social Security's Administration's ('SSA') determination that Ms. Hughes is disabled." Doc. #56 at 25. But ERISA does not require that a plan administrator award disability benefits simply because the claimant has been awarded disability benefits by the SSA. *See Ingravallo v. Hartford Life and Accident Ins. Co.*, 563 F. App'x 796, 799 (2d Cir. 2014). Nor must a plan administrator necessarily explain why its disability decision differs from the decision reached by the SSA. *See Richard v. Fleet Fin. Grp. Inc. Ltd. Emp. Benefits Plan*, 367 F. App'x 230, 233 (2d Cir. 2010).

Here, Hartford's decision acknowledged that Hughes had been awarded Social Security benefits but explained that its decision was based in part on different medical evidence, including evidence that arose in the seven-month period between when Social Security benefits were awarded in March 2016 and when Hartford determined that Hughes was no longer disabled in October 2016. AR2537. Hartford also noted that the SSA expected Hughes's health to improve and intended to conduct a re-evaluation in 2018. *Ibid.* Hughes has not shown any error of law or an abuse of discretion with respect to Hartford's consideration of the decision of the SSA.

I have additionally considered each and every one of the other arguments Hughes makes that Hartford did not afford her full and fair review on remand, including Hughes's cursory conflict of interest argument, and found them to be unpersuasive. *See* Doc. #68 at 40-43 (discussing why alleged conflict of interest is not entitled to significant weight). On the whole, I find that Hartford's consideration of Hughes's claim on remand did not violate its duty to

conduct a full and fair review. Therefore, I decline to apply *de novo* review and will instead apply a deferential arbitrary-and-capricious standard of review to Hartford's appeal decision on remand.

### B. The merits

"Under arbitrary and capricious review, a court will only overturn an administrator's determination where it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Kirkendall v. Halliburton, Inc.*, 760 F. App'x 61, 64 (2d Cir. 2019) (quotation omitted). Substantial evidence "is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker and] . . . requires more than a scintilla but less than a preponderance." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995) (citations omitted). A court may not substitute its own judgment for that of the plan administrator as if it were considering the issue of eligibility anew. *See Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 83-84 (2d Cir. 2009).

The burden is on ERISA claimants to establish an entitlement to benefits, and the burden remains on the claimant even if benefits were previously awarded and then later denied or discontinued. *See Paese v. Hartford Life & Acc. Ins. Co.*, 449 F.3d 435, 441 (2d Cir. 2006); *Tretola v. First Unum Life Ins. Co.*, 2015 WL 509288, at *22 (S.D.N.Y. 2015). Within this framework, "administrators may exercise their discretion in determining whether a claimant's evidence is sufficient to support his claim." *Whelehan v. Bank of Am. Pension Plan for Legacy Companies-Fleet-Traditional Benefit*, 621 F. App'x 70, 71-72 (2d Cir. 2015) (citation omitted).

The Plan defines "disability" or "disabled" to mean, "You are prevented from performing one or more of the Essential Duties of: 1) Your Occupation during the Elimination Period; 2) Your Occupation of the 24 month(s) following the Elimination Period, and as a result Your

Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings; and 3) after that, Any Occupation." AR19. On appeal, Hartford determined that Hughes "was not Disabled from Any Occupation, as defined in the LTD Policy, beyond 10/05/2016." AR2537. I find that there is substantial evidence supporting Hartford's decision.

First, there is evidence in the administrative record indicating that Hughes's vertigo and migraine conditions have either improved over time or are not debilitating to the point of disability as defined by the plan. For instance, several of Dr. Hoffmann's notes indicate improvements in Hughes's condition. A note dated October 6, 2014 states that "[t]he pain of the migraines is gone, but the associated symptoms she had with them are still present." AR1161. Another note dated March 11, 2015 states that Hughes "has had a significant improvement in her vertigo and dizziness with higher doses of dexamethasone orally." AR1155. A third note dated September 29, 2015 states that Hughes "fel[t] like her symptoms are gradually improving." AR1143. A fourth note dated April 20, 2016 states again that Hughes "fel[t] the symptoms are gradually improving" and also states that Dr. Hoffmann noted on September 29, 2016 that "overall, [Hughes] is making progress with improvement of the balance system." AR1133. Similarly, in an interview on May 12, 2016 with a representative from Hartford, Hughes stated that in the last six months, her condition had improved, that her balance "ha[d] definitely improved, but it also ebb[ed] and flow[ed]," and that she felt she was making progress. AR152; AR166.

There is also evidence in the administrative record that the Botox treatments helped to control Hughes's migraine condition. Hughes began going to Atlanta Neurology PC in 2013, and a note dated May 23, 2013 states that the "[h]eadache[s] typically occur[] constantly," that Hughes experienced more than 15 headache days per month, and that Hughes met the

requirements for a Botox trial. AR2137. In October, after Hughes began receiving Botox treatments, a note states that her "migraine headaches have reduced by at least 100 fewer headache hours per month and/or 7 fewer headache days per month," that Hughes was "satisfied with the results of Botox for migraine prevention and management," and "report[ed] having only a few headaches since getting Botox." AR2005. In September 2014, Hughes told Hartford that she "now only ha[s] migraines approx 3 [times per month]." AR714.

Indeed, the notes from Hughes's visits to Atlanta Neurology PC over the years provide evidence that the Botox treatments continued to help Hughes's migraine condition. For example, a note dated July 28, 2016 states that Hughes "reports continued control of migraines," and that Hughes's estimate of 16 headache days in the last 90 days that "confined her to bed" was "much better than baseline when she was having headaches essentially daily." AR2741. And a note dated November 1, 2016 states that Hughes "reports continued improvement of migraines (versus chronic migraines prior to receiving Botox for migraine prevention.)" AR2737.

Several notes over 2015 and 2016 report similar sentiments of continued control or stabilization of migraines with the Botox treatments. *See, e.g.*, AR2759 (February 12, 2015); AR2756 (June 30, 2015); AR2753 (October 6, 2015); AR2749 (January 19, 2016); AR2745 (April 28, 2016). This control seems to have continued as the years have gone on. For instance, a note dated April 19, 2018 states that Hughes "would like to continue the Botox injections as she does find benefit from the Botox as the Botox reduces the frequency, severity, and duration of migraines" and that she "does not want any further changes to regimen at this time." AR2865. And a note dated September 17, 2018 states that Hughes "feels that the Botox does provide adequate relief in preventing her migraines during the first 3 months after getting the injections," though the migraines were "again problematic" when Hughes was overdue for injections.

AR2861. The note also states that Hughes "estimates having at least > 100 fewer headache hours versus pre-Botox," and that this made the Botox treatments "effective and worthwhile." *Ibid.*

There is also substantial evidence in the administrative record that in 2016, at the time Hartford made its initial decision, Hughes's own treating providers thought that some restrictions were unnecessary. In August 2016, before Hartford terminated Hughes's benefits, Hartford consulted with Hughes's treating providers, asking in various form letters whether the provider still recommended any specific limitations on Hughes's activity:

- **Dr. Hoffmann.** In a form letter to Dr. Hoffmann, Hartford asked whether Hughes "is capable of the following sedentary level of activity: activity for 40 hours per week: primarily seated with some standing/walking throughout the day, and; allows for full use of the upper extremities. Lifting/carrying will be limited to 0-10 pounds occasionally, afforded will be the opportunity to change body positions/postures as needed for comfort (by walking, standing, or moving about)." AR1448. Dr. Hoffmann checked "Yes," and wrote that Hughes "will not be able to drive when she is having vertigo. She continues to have disequilibrium and dizziness when reading or using a computer for long periods of time." AR1448-49.[3]

- **Dr. Gwynn.** In response to the question, "Have you recommended any specific activity limitations secondary to any condition for which you are treating?" Dr. Gwynn of Atlanta Neurology checked, "No," and wrote "can't bend over frequently" and "needs additional breaks throughout day." AR1488.

- **Dr. Cronin.** On a separate form with the same language, Dr. Cronin checked, "Yes," and wrote, "Limited reaching, turning, lifting\carrying, head movements, bending, climbing, balancing, eye movements, pushing\pulling, walking on uneven surfaces, operating machinery." AR1496.

- **Dr. Haley.** On a similar form asking whether the physician "recommended any activity limitations secondary to any condition that you are treating that would preclude occupational activity," Dr. Greg Haley, a psychiatrist, checked, "No," and wrote, "She is physically limited and secondarily limited by those conditions that stem from it: depression." AR1491.

---

[3] More specifically, Hartford's letter request to Dr. Hoffmann included surveillance of Hughes as well as a report of a face-to-face interview with her that Dr. Hoffmann refused to review. AR1448. The letter then went on to say that "we are asking for an update of your opinion regarding her current level of capability," and adding that "[b]ased on her reports of 90% improvement in pain symptoms, of intermittent vertigo, and rare migraines do you feel she is capable of the following sedentary level of activity: activity for 40 hours per week, …." *Ibid.* Dr. Hoffmann checked "Yes" rather than "No" in response to this query which was answered on August 30, 2016—several weeks prior to Hartford's decision to terminate benefits.

- **Dr. Delfavero.** In response to a similar question, Dr. Niklaus Delfavero, a chiropractor, checked, "No." AR1507.

While Hughes seeks to minimize the probative value of these responses, the fact that her treating providers told Hartford that she was capable of 40 hours per week of activity or answered with only limited restrictions is evidence Hartford could permissibly consider and weigh in making its decision.

Hartford also relied on reviews by independent medical experts, which is a common practice for plan administrators evaluating ERISA claims. *See Hobson*, 574 F.3d at 90. Hartford first contacted Medical Consultants Network, who enlisted Dr. Jares to provide a peer review of Hughes's records. AR1437-44. Dr. Jares's report, dated September 23, 2016, summarized the records reviewed and then answered specific questions. *Ibid.* In response to the questions:

> Given the totality of the medical evidence and other information as provided, what is the highest level of functional capacity that this claimant is reasonably capable of physically performing up to 40 hours/week—if claimant is limited in computer use how often can she use the computer at one time and then how long does she need a break before she can resume working at a computer? What supports the limitation other than self reports of ability from claimant?

Dr. Jares wrote that Hughes "may sit unrestricted. She may stand up to 10 minutes at a time and up to one hour total in an eight-hour work shift. . . . She should not bend, kneel, stoop, crouch, or crawl due to potential of exacerbating her vertigo." AR1442. As for computer use, Dr. Jares wrote that Hughes "may use a computer up to eight hours a day but again should be afforded a two or three-minute break every 30 minutes." *Ibid.*

After Hughes appealed Hartford's decision, Hartford obtained a Neurology Independent Medical Examination report, dated May 11, 2017, from Dr. Schiff through Medical Consultants Network. AR 826-32. In reviewing Hughes's records, Dr. Schiff wrote that Hughes's chronic migraines "responded well to botulinum therapy." AR828. Dr. Schiff's assessment stated that

based on the review of relevant records, statements, and the April 2016 surveillance, as well as his in-person examination of Hughes, the only restrictions and limitations he recommended were to "prevent [Hughes] from performing frequent daily high-level balance activities or working at unprotected heights or dangerous machinery." AR832.

Dr. Schiff further wrote that he would not "propose any restrictions related to her migraine headaches and the ones above secondary to questionable vestibular dysfunction." *Ibid.* Dr. Schiff stated that he believed Hughes "can work consistently and sustain[] a 40 hour work week" and that he would "not expect [Hughes] to miss work from her condition." *Ibid.* Dr. Schiff reported an inconsistency present with "normal examinations and observed function despite reported symptoms" and "excellent ability to walk balance move and turn rapidly as well as keep her head and neck in multiple positions for sustained periods of time." *Ibid.*

After I issued my prior ruling of remand, Hughes requested that Hartford hire a medical consultant with "appropriate credentials for Ms. Hughes' disabling conditions," meaning a neurologist for the migraines and a neurotologist for the vestibular disability. AR2731. Hartford did just that: it retained Dr. Slattery and Dr. Maraian through a third-party vendor.

Both Dr. Slattery and Dr. Maraian wrote initial reports and addendum reports in response to Hughes's counsel's rebuttal submitted to Hartford regarding the initial reports. Both Dr. Slattery and Dr. Maraian reviewed Hughes's extensive medical records, the surveillance video, Hartford's records, Hughes's statements, witness statements from Hughes's partner and friend, Hughes's counsel's interviews with Hughes's physicians, and legal correspondence from Hughes's counsel, among other records. AR2663-64; AR2677-78.

In his initial report, Dr. Slattery, the neurotologist, first went through Hughes's extensive medical records and office visit notes from her physicians. AR2677-84. Based on this review,

Dr. Slattery concluded that Hughes's symptoms, including those related to vertigo "can all be explained by severe migraine disease" and that "vestibular migraine appears to be the primary problem." AR2684-85. Dr. Slattery did not think that the "signs and tests results" were "conclusive of a peripheral vestibular dysfunction that is continued in an uncompensated fashion," and recounted his analysis of the tests administered to Hughes and her reported symptoms that led him to that conclusion. AR2685-86. Given that he thought the symptoms were most compatible with a vestibular migraine, Dr. Slattery felt that his "assessment as a neurotologist dealing with peripheral vestibular dysfunction has a very limited role with this case." AR2686. Dr. Slattery wrote that he did not feel that any restrictions beyond avoiding heights or the use of machinery were required for Hughes. AR2684.

In his addendum report, Dr. Slattery reviewed the November 2016 posturography testing that Hughes's counsel emphasized in his rebuttal. AR2583. Dr. Slattery wrote that it is "well known posturography is not a direct test of the vestibular system" and that it is "equally well known that posturography is subject to both false positive and false negative errors." *Ibid.* Dr. Slattery concluded that the posturography testing "in isolation and in combination with the other clinical data provided does not point to a peripheral vestibular disorder." *Ibid.* Dr. Slattery stated that he could not conclude that there was a disability related to a peripheral vestibular disorder and that Hughes's clinical course was most consistent with a central vestibular disorder, such as vestibular migraine. *Ibid.*

Dr. Slattery further stated that he did not suspect a peripheral vestibular disorder underlies Hughes's symptomology, contrary to the assertions of her treating providers. AR2583-84. Dr. Slattery stated that he thinks Hughes likely experienced "the expected transient

24

vestibulopathy that occurs for several months after gentamicin therapy," but that her symptoms from 2016 onward are "in line with vestibular migraine." AR2584.

In her initial report, Dr. Maraian, the neurologist, conducted a records review and went through each of the visit notes from Dr. Hoffmann and other treating providers. AR2663-74. In describing her review, Dr. Maraian wrote that, "[t]here is no documentation of uncontrolled pain. During clinic visits, the claimant was not in any distress. There is no documentation that the claimant required hospitalization or urgent treatment in the ED for uncontrolled headaches. There is no evidence that headaches or migraines caused the claimant any impairment of function." AR2675. Dr. Maraian added that in regard to the vertigo, "[t]here is no documentation in the records that claimant was unable to work full time from 10/6/16 onward within the above restrictions and limitations," that is, working at unprotected heights or with heavy machinery. *Ibid.* Although Dr. Hoffmann had stated in June 2018 that Hughes's vestibular symptoms were "too frequent and too severe to allow her to work reliably," Dr. Maraian wrote that "[t]his statement reflects the doctor's opinion which is not supported by the doctor's records." *Ibid.*

In her addendum report, Dr. Maraian wrote that while a posturography test from November 2016 indicated that Hughes had balance difficulties, there "is no evidence that the condition causes total functional impairment." AR2592. Dr. Maraian stated that the visit notes "showed that [Hughes] was not in any distress when she was seen in clinic by the treating providers" and that her reported symptoms and complaints did "not prompt the treating providers to escalate her medication or refer her for aggressive inpatient treatment." *Ibid.* "Typically," according to Dr. Maraian, "when a patient is disabled by her symptoms and reports this to the doctor, aggressive measures are undertaken to help the patient. The claimant's records did not

demonstrate documentation of aggressive medication changes in response to the claimant's complaints." AR2593.

Hughes argues that Hartford failed to accept Hughes's treating providers' assessments. Doc. #56 at 36-37. But "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Hobson*, 574 F.3d at 85 (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)). A plan may therefore "act[] within its discretion in relying upon the conclusions of its independent consultants' [] reports." *Ibid.* Even "when faced with a conflict between the opinion of the treating physician and the opinions of reviewing doctors and independent consultants, it is not arbitrary and capricious for the plan to prefer the reviewing doctors." *Baird v. Prudential Ins. Co. of Am.*, 2010 WL 3743839, at *10 (S.D.N.Y.) (citation omitted), *aff'd*, 458 F. App'x 39 (2d Cir. 2012). Hughes has not shown that it was arbitrary and capricious for Hartford to prefer the opinions of independent consultant physicians.

Hughes also argues that Hartford ignored her own subjective assessment of her condition and her pain. Doc. #56 at 37. While the "subjective element of pain is an important factor to be considered in determining disability," *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 136 (2d Cir. 2001), the Second Circuit has concluded that "it is not unreasonable for ERISA plan administrators to accord weight to objective evidence that a claimant's medical ailments are debilitating in order to guard against fraudulent or unsupported claims of disability," *Hobson*, 574 F.3d at 88. I am cognizant that the nature of Hughes's claims—vertigo and migraines—are, to a large degree, based on subjective evidence. But it is not arbitrary and capricious for Hartford

26

to afford weight to objective evidence and the review of its independent consultants. Hartford is under no obligation to accept Hughes's statements at face value, and it could appropriately weigh them in consideration of the opinions of its independent consultants.

To be sure, there is significant evidence in the record to support Hughes's position. When prompted by questions from Hughes's own counsel, some of Hughes's treating providers believe that Hughes is incapacitated. *See, e.g.*, AR2940 ("Ms. Hughes' condition is chronic in nature. It has not improved enough to allow her to return to work at any capacity."); AR2951 ("[T]here's no way that she could sustain any employment right now."); AR2991 ("I would say generally, with the length of time that her symptoms have been present, then I would say it's unlikely that she's going to be able to go back to full employment."). And Hughes's personal statement dated May 14, 2019 extensively details her struggle with her conditions and her desire to return to work. AR2921-28. As Hughes states, being "unable to work has been the most challenging time" of her life. AR2928.

But my role here is not to decide in the first instance whether Hughes has proved that she was and is disabled. My role is only to determine if there is substantial evidence to support Hartford's conclusion that she was *not* disabled and to evaluate Hughes's claims that Hartford failed to follow the required procedures or other law when evaluating her claim and appeal. I find that there is substantial evidence in the record supporting Hartford's decision and conclude that Hartford's decision to terminate benefits was not arbitrary or capricious.

## CONCLUSION

For the foregoing reasons, the Court finds in favor of defendant Hartford Life and Accident Insurance Company. The Court GRANTS Hartford's motion for summary judgment (Doc. #57) and DENIES Hughes's cross-motion for summary judgment (Doc. #56). The Clerk of

Court shall enter judgment and close this case.

It is so ordered.

Dated at New Haven this 25th day of March 2021.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge